LOURIE, Circuit Judge.
Appellants (collectively, “EchoStar”) appeal from the district court’s decision finding EchoStar in contempt of two separate provisions of the court’s permanent injunction order. See TiVo Inc. v. Dish Network Corp., 640 F.Supp.2d 853 (E.D.Tex.2009). A panel of this court affirmed the district court’s decision, concluding that EchoStar had in fact violated the infringement provision of the permanent injunction under our earlier decision in KSM Fastening Systems v. H.A. Jones Co., 776 F.2d 1522, 1532 (Fed.Cir.1985), and that EchoStar had waived its unenforceability arguments on the disablement provision of the permanent injunction. TiVo, Inc. v. EchoStar Corp., No. 2009-1374, slip op. at 1 (Fed. Cir. Mar. 4, 2010), vacated, TiVo, Inc. v. EchoStar Corp., 376 Fed.Appx. 21, 21-22 (Fed.Cir.2010). EchoStar petitioned for *876 rehearing en banc, urging clarification of the proper scope of the colorable differences test and challenging the enforceability of the district court’s injunction based on overbreadth and vagueness. We granted EchoStar’s petition and directed the parties to address the circumstances under which a finding of contempt by a district court would be proper as to infringement by newly accused products and also address the proper time to raise the defenses of vagueness and overbreadth of an injunction.
As a result of our consideration of this case en banc, we hold that the two-step KSM analysis is unsound in contempt cases and we clarify the standards governing contempt proceedings in patent infringement cases. We therefore vacate the district court’s finding of contempt of the infringement provision of the permanent injunction, and remand to the district court to make a factual determination of colorable differences under the new standard we lay out here. We thus vacate in part the damages awarded to TiVo for EchoStar’s continued infringement. However, we once again affirm the district court’s finding of contempt of the disablement provision of the permanent injunction and its sanctions award in its entirety because we conclude that EchoStar waived arguments of overbreadth and vagueness with regard to that provision.
Background
TiVo Inc. (“TiVo”) owns U.S. Patent 6,233,389 (“the '389 patent” or “TiVo’s patent”), which is entitled “Multimedia Time Warping System.” The patented technology allows television users to simultaneously record and play (“time-shift”) television broadcasts using what is commonly known as a digital video recorder (“DVR”). A DVR allows users to fast-forward, rewind, pause, and replay a “live” television program while it is playing on the television set. TiVo’s patent covers various features essential to the working of a DVR.
In 2004, TiVo sued EchoStar in the United States District Court for the Eastern District of Texas, alleging that its receivers infringe “hardware” claims (claims 1 and 32) and “software” claims (claims 31 and 61) of the '389 patent. The hardware claims are not at issue in this appeal.
Claim 31 of the '389 patent is the first of the two software claims. It provides as follows:
A process for the simultaneous storage and play back of multimedia data, comprising the steps of:
[1] providing a physical data source, wherein said physical data source accepts broadcast data from an input device, parses video and audio data from said broadcast data, and temporarily stores said video and audio data;
[2] providing a source object, wherein said source object extracts video and audio data from said physical data source;
[3] providing a transform object, wherein said transform object stores and retrieves data streams onto a storage device;
[4] wherein said source object obtains a buffer from said transform object, said source object converts video data into data streams and fills said buffer with said streams;
[5] wherein said source object is automatically flow controlled by said transform object;
[6] providing a sink object, wherein said sink object obtains data stream buffers from said transform object and outputs said streams to a video and audio decoder;
*877 [7] wherein said decoder converts said streams into display signals and sends said signals to a display;
[8] wherein said sink object is automatically flow controlled by said transform object;
[9] providing a control object, wherein said control object receives commands from a user, said commands control the flow of the broadcast data through the system; and
[10] wherein said control object sends flow command events to said source, transform, and sink objects.
'389 patent claim 31 (emphases added). Claim 61 is similar to claim 31, except that it recites an apparatus rather than a process. See id. claim 61.
The accused EchoStar satellite television receivers can be broadly classified into two categories based on the processing chip employed by the receiver: the “50X” series and the “Broadcom” series. The district court submitted questions of infringement and invalidity to the jury. TiVo, Inc. v. Dish Network Corp., No. 2:04-CV-00001, ECF No. 690 (E.D.Tex. Apr. 13, 2006) [hereinafter Verdict Form]. On infringement, the jury was asked whether eight different models of EchoStar receivers, three of the 50X series and five of the Broadcom series, literally infringed the hardware or software claims of TiVo’s patent. Id. at 2-3. The jury answered “yes” for each of the asserted claims, for each of the eight listed receivers. Id. It also found, by clear and convincing evidence, that EehoStar’s infringement was willful, id. at 4, and awarded TiVo approximately $74 million in lost profits and reasonable royalties, id. at 8. The district court entered judgment on the verdict and issued a permanent injunction against EchoStar. In its injunction, the district court ordered EchoStar: (1) to stop making, using, offering to sell, and selling the receivers that had been found infringing by the jury (the “infringement” provision) and (2) to disable the DVR functionality in existing receivers that had already been placed with EchoStar’s customers and in new placements that were yet to be placed with EchoStar’s customers (the “disablement” provision). The infringement provision reads:
Each Defendant, its officers, agents, servants, employees, and attorneys, and those persons in active concert of participation with them who receive actual notice hereof, are hereby restrained and enjoined, pursuant to 35 U.S.C. 283 and Fed.R.Civ.P. 65(d), from making, using, offering to sell, selling, or importing in the United States, the Infringing Products, either alone or in combination with any other product and all other products that are only colorably different therefrom in the context of the Infringed Claims, whether individually or in combination with other products or as a part of another product, and from otherwise infringing or inducing others to infringe the Infringed Claims of the '389 patent.
J.A.162. The disablement provision reads:
Defendants are hereby FURTHER ORDERED to, within thirty (30) days of the issuance of this order, disable the DVR functionality (i.e., disable all storage to and playback from a hard disk drive of television data) in all but 192,-708 units of the Infringing Products that have been placed with an end user or subscriber. The DVR functionality, i.e., disable all storage to and playback from hard disk drive of television data) [sic] shall not be enabled in any new placements of the Infringing Products.
Id. The injunction defines both the terms “Infringing Claims” and “Infringing Products”:
[T]he Court thereby enters judgment for Plaintiff against Defendants for will *878 ful infringement of U.S. Patent No. 6,233,389 (“'389 patent”), claims 1, 5, 21, 23, 32, 36, 52, 31 and 61 (“the Infringed Claims”) by Defendants’ following DVR receivers (collectively the “Infringing Products”): DP-501; DP-508; DP-510; DP-522; DP-625; DP-721; DP-921; and the DP-942.
Id. 161. The district court’s definition of the term “Infringing Products” listed the same model numbers that the jury in its verdict had found infringing.
Following the entry of final judgment by the district court, we affirmed in part, reversed in part, and remanded the district court’s decision. EchoStar had appealed issues of claim construction and infringement. We found that the district court had incorrectly construed at least one limitation of the hardware claims and reversed the portion of the judgment upholding the jury’s verdict that EchoStar’s DVRs literally infringed the hardware claims. TiVo, Inc. v. EchoStar Commc’ns Corp., 516 F.3d 1290, 1304-05 (Fed.Cir.2008). However, we found no error in the district court’s construction of the software claims and also affirmed the jury’s verdict that the EchoStar devices infringed the software claims of the '389 patent. Id. at 1310.
At that time, EchoStar had not appealed the district court’s grant of a permanent injunction. In our opinion, we noted that the district court’s injunction, which had been stayed during the course of the appeal, would take effect following our decision. Id. at 1312. We remanded to the district court to make a determination as to any additional damages that TiVo may have sustained while the stay of the permanent injunction had been in effect. Id. Our mandate issued, and the injunction became effective, on April 18, 2008.
Following the decision on the appeal, TiVo moved the district court to find EchoStar in contempt of the court’s permanent injunction. After conducting a series of hearings on TiVo’s motion, the district court ruled that EchoStar was in contempt of both provisions of its permanent injunction. With regard to the infringement provision, the district court rejected EchoStar’s argument that it had redesigned its infringing receivers in a manner that rendered them more than colorably different from the adjudged infringing devices. EchoStar contended that it had redesigned the infringing software on both the 50X and the Broadcom receivers so that the “parsing” limitation of claims 31 and 61 was no longer satisfied. EchoStar argued that was because it had replaced the “start code detection” feature, which was originally alleged to meet the parsing limitation, with a “statistical estimation” feature. Video recordings in a DVR are comprised of sequential frames of audio and video data that are received as a data stream and stored to the hard drive of the DVR. The start code detection feature in the infringing receivers parsed for codes that designated the start of each video frame and indexed those codes so as to allow the system to precisely locate and access a required frame from the data stream whenever needed, such as during rewind and fast forward operations by the user. EchoStar contended that functionality was now accomplished by using a statistical estimation feature that relied on average frame rate statistics to estimate the location of a given video frame. EchoStar further argued that it had modified the infringing software on the Broadcom receivers so that the “automatically flow controlled” limitation of claims 31 and 61 was no longer satisfied. On that point, EchoS-tar’s contention was that it completely eliminated the “record buffer” that existed in its original software to provide flow control of data that was being transferred *879 from a pool of data buffers to the hard drive of the receiver. Thus, in its modified software, EchoStar argued, there was no “automatic flow control,” thereby allowing for some data loss whenever there was an overflow of data in one of the data buffers resulting from a difference in data transfer rates to and from the buffer.
The district court evaluated the two modifications and found by clear and convincing evidence that the modified DVR software was not more than colorably different from the infringing software, and did continue to infringe the software claims. On EchoStar’s contention that the “parsing” limitation was not met, the court held that the modified receivers, like the adjudicated ones, continued to utilize “PID filtering,” which EchoStar itself had recognized as “parsing,” and thus were not more than colorably different from the adjudicated receivers. TiVo, 640 F.Supp.2d at 870. As for EchoStar’s contention that it had eliminated the automatic flow control limitation by removing one of the buffers, the court, looking at the actual amount of data loss in the modified software, discredited EchoStar’s claim, and held that, in essence, it was a change from eleven buffers to ten, and did not render the modified devices more than colorably different from the original device. Id. at 871. In the absence of more than a colorable difference between EchoStar’s original and modified devices, the district court concluded that contempt proceedings were appropriate under our decision in KSM. Id. at 871. Because it then found clear and convincing evidence of continued infringement of the software claims by the modified devices, the district court held EchoS-tar to be in violation of the infringement provision of the injunction. Id. at 873.
Moreover, the district court held that even if EchoStar had achieved a noninfringing design-around, EchoStar would still be in contempt because it had failed to comply with the plain language of the disablement provision in the district court’s order requiring it to disable DVR functionality completely from the specifically named receiver models adjudged to be infringing at trial. EchoStar argued to the district court that because the disablement provision required it to disable “Infringing Products,” EchoStar was merely required to disable infringing DVR software, which did not exist once it had redesigned its receiver software. The district court rejected that argument, reasoning that if EchoStar believed that the infringing receivers in their entirety were not subject to the order or that the order improperly covered noninfringing practices, then EchoStar should have requested that the district court modify its order or should have challenged the scope of the injunction on appeal. Id. at 874. The district court concluded that having failed to do either at the time that the injunction issued, EchoS-tar had waived any argument that the injunction was overbroad. Id.
In view of EchoStar’s contempt of the court’s order, the district court imposed sanctions against EchoStar in the amount of nearly $90 million. TiVo Inc. v. Dish Network Corp., 655 F.Supp.2d 661, 666 (E.D.Tex.2009). The court also awarded damages to TiVo for the continued infringement by EchoStar’s redesigned software. Id. Further, the court amended its earlier injunction, requiring EchoStar to seek the court’s approval before implementing future noninfringing workarounds to its DVR software.
Discussion
A.

Contempt for Violation of the Infringement Provision

We begin by providing clarification of the standard to be used for determining *880 contempt in cases of alleged continued infringement. EchoStar argues that it was improper for the district court to decide issues relating to continued infringement by EchoStar’s modified software in a summary contempt proceeding, as opposed to a new trial on the merits, and to find EchoStar in contempt of the infringement provision of the injunction. According to EchoStar, its modifications to the infringing DVR software rendered the modified receivers more than colorably different from the one found infringing in the prior jury trial. Moreover, EchoStar contends, it undertook a “Herculean” effort in redesigning the DVR software in its receivers and, by obtaining opinions of counsel, it made a good faith effort to ensure that its devices would no longer infringe the software claims of TiVo’s patent. We address each of these arguments in turn.
1. Good Faith as a Defense to Civil Contempt
We first consider EchoStar’s arguments that contempt is improper “where the defendant engaged in diligent, good faith efforts to comply with the injunction and had an objectively reasonable basis to believe that it was in compliance.” EchoStar argues that it employed 15 engineers for 8000 hours to complete the software redesign, which took a year. Similarly, it stresses the fact that it obtained an opinion of noninfringement from a respected patent law firm. It further contends that the redesign, by allowing for data loss, compromised performance in order to avoid infringement of TiVo’s patent, giving it a product inferior to what it previously had. In light of this evidence, EchoStar argues, the district court was incorrect in finding it in contempt.
We disagree and conclude that EchoStar misreads the law. We have made it clear that, under Supreme Court precedent, a lack of intent to violate an injunction alone cannot save an infringer from a finding of contempt. Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 154 F.3d 1345, 1353 (Fed.Cir.1998) (“The general rule in civil contempt is that a party need not intend to violate an injunction to be found in contempt.”). “Since the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act.... An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently.” McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949). We are thus bound by Supreme Court precedent to reject EehoStar’s good faith arguments and its reliance upon opinions of counsel. Although a defendant’s diligence and good faith efforts are not a defense to contempt, these factors may be considered in assessing penalties, a matter as to which the district court has considerable discretion. See, e.g., Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 582 (5th Cir.2005); Stryker Corp. v. Davol, Inc., 234 F.3d 1252, 1260 (Fed.Cir.2000). However, the district court was correct in rejecting EchoStar’s good faith arguments in deciding whether a violation had occurred.
2. The Propriety of a Contempt Proceeding on Infringement
In recent times, we have required district courts to make a two-part inquiry in finding a defendant in contempt of an injunction in patent infringement cases. KSM Fastening Sys., Inc. v. H.A. Jones Co., 776 F.2d 1522, 1530-32 (Fed.Cir.1985). First, the court must determine whether a contempt hearing is an appropriate setting in which to adjudge infringement by the redesigned product. Id. at 1532. The court may do this by comparing the accused product with the adjudged infringing *881 product to determine if there is “more than a colorable difference” between the accused product and the adjudged infringing product such that “substantial open issues with respect to infringement” exist. Id. Where the court finds that to be the case, a new trial is necessary to determine further infringement and the court may not proceed with a contempt finding. Id. Only in cases where the court is satisfied on the threshold inquiry of the appropriateness of a contempt proceeding can a court inquire whether the redesigned product continues to infringe the claims as previously construed. Id.
We conclude that KSM’s two-step inquiry has been unworkable and now overrule that holding of KSM. KSM crafted a special rule for patent infringement cases, in that it required a threshold inquiry on the propriety of initiating a contempt proceeding. We recognize now that inquiry confuses the merits of the contempt with the propriety of initiating contempt proceedings. Moreover, as a practical matter, district courts do not separately determine the propriety of a contempt proceeding before proceeding to the merits of the contempt itself. As a result, we will telescope the current two-fold KSM inquiry into one, eliminating the separate determination whether contempt proceedings were properly initiated. That question, we hold, is left to the broad discretion of the trial court to be answered based on the facts presented. Additive Controls, 154 F.3d at 1349 (The district court “has broad discretion to determine how best to enforce its injunctive decrees.”). What is required for a district court to hold a contempt proceeding is a detailed accusation from the injured party setting forth the alleged facts constituting the contempt. As with appeals from findings of civil contempt in other areas of law, we will only review whether the injunction at issue is both enforceable and violated, and whether the sanctions imposed were proper. Allegations that contempt proceedings were improper in the first instance do not state a defense to contempt. As to the question whether an injunction against patent infringement has been violated, courts should continue to employ a “more than colorable differences” standard as discussed below.
Thus, we decline to address EchoS-tar’s argument that the district court, applying the old KSM standard, improperly held contempt proceedings in this case, although we note that there may be circumstances in which the initiation of contempt proceedings would constitute an abuse of discretion by the district court. Under our holding today, we find no abuse of discretion by the district court in proceeding to contempt. TiVo moved the district court to find EchoStar in contempt. Having reviewed the computer source code of the modifications to the infringing software, TiVo asserted to the district court that the modified EchoStar receiver software was not more than colorably different from the original one, and thus that EchoStar was in violation of the infringement provision of the permanent injunction. Given its familiarity with the parties, the patent at issue, and the infringing products, we do not find an abuse of discretion in the district court’s decision to hold contempt proceedings.
3. The “More than Colorable Differences” Test
(a) Discussion of the Law
The criteria for adjudicating a violation of a prohibition against continued infringement by a party whose products have already been adjudged to be infringing is a matter of Federal Circuit law. The Supreme Court has cautioned that contempt “is a severe remedy, and should *882 not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant’s conduct.” Cal. Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885); see also MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co., 767 F.2d 882, 885 (Fed.Cir.1985) (citing Cal. Artificial Stone Paving Co., 113 U.S. at 618, 5 S.Ct. 618). We have previously interpreted that inquiry in patent cases as one of colorable differences between the newly accused product and the adjudged infringing product. Abbott Labs. v. TorPharm, Inc., 503 F.3d 1372, 1380 n. 3 (Fed.Cir.2007). Thus, the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes.
We have stated the test for colorable differences as one that requires determining whether “substantial open issues with respect to infringement to be tried” exist. KSM, 776 F.2d at 1532. In some cases, that has misled district courts to focus solely on infringement by the newly accused devices in deciding contempt. That is the case here. Today, we reject that infringement-based understanding of the colorably different test. Instead of focusing solely on infringement, the contempt analysis must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products.
The primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises “a fair ground of doubt as to the wrongfulness of the defendant’s conduct.” Cal. Artificial Stone Paving Co., 113 U.S. at 618, 5 S.Ct. 618. The analysis must focus not on differences between randomly chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, Additive Controls, 154 F.3d at 1350, but on those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product. Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims. Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant. If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant. Contempt is then inappropriate. Arbek Mfg., Inc. v. Moazzam, 55 F.3d 1567, 1570 (Fed.Cir.1995) (“[T]he modifying party generally deserves the opportunity to litigate the infringement questions at a new trial.”).
The significance of the differences between the two products is much dependent on the nature of the products at issue. The court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art at the time the modification was made.[1] A nonobvious modification *883 may well result in a finding of more than a colorable difference. Where useful, a district court may seek expert testimony in making the determination. See Abbott Labs., 503 F.3d at 1380 (allowing the use of expert testimony on the colorable differences question). The analysis may also take account of the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation. State Indus. Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed.Cir.1985) (“One of the benefits of a patent system is the so-called ‘negative incentive’ to ‘design around’ a competitor’s products”). But an assertion that one has permissibly designed around a patent should not be used to mask continued infringement. Determining the requisite level of difference is a question of fact.
Conversely, when a court concludes that there are no more than color-able differences between the adjudged infringing product and modified product, a finding that the newly accused product continues to infringe the relevant claims is additionally essential for a violation of an injunction against infringement. KSM, 776 F.2d at 1528. Thus, the court is required to evaluate the modified elements of the newly accused product against the asserted claim, on a limitation by limitation basis, to ensure that each limitation continues to be met. In making this infringement evaluation, out of fairness, the district court is bound by any prior claim construction that it had performed in the case. The patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences.[2] As with other factual determinations, both findings are reviewed for clear error. Where the court finds a violation and awards sanctions, such a sanctions award is reviewable for an abuse of discretion.
(b) Application of the “More Than Colorable Differences” Test to This Case
Applying the test in this case, one of the features of EchoStar’s original receivers that TiVo relied upon to prove infringement to the jury was the start code detection feature. TiVo argued, and the jury accepted, that feature satisfied the “parsing” limitation found in the software claims. It is undisputed that EchoStar replaced that feature with a statistical estimation feature. In finding contempt of the infringement provision of the injunction under our KSM standard, TiVo alleged, and the district court looked to, a different feature of EchoStar’s modified devices, viz., the PID filter, as meeting the parsing limitation of the software claims. Although the parties disputed their prior positions on whether the PID filter performs “parsing,” TiVo never unequivocally alleged prior to the contempt stage that the PID filter met that claim limitation. That was a new allegation. However, because the district court concluded that EchoStar had itself conceded that the PID filter performs a type of parsing, the court held that EchoStar’s modified devices continued to infringe the software claims, and that EchoStar was in contempt of the infringement provision.
*884 The district court found no need to evaluate the newly designed statistical estimation feature to determine whether it was significantly different from the start code detection feature, the feature that had been previously alleged by TiVo to meet the parsing claim limitation, and whether the replaced feature continued to meet the parsing limitation of the software claims. Our holding today requires that those issues be determined on remand because the statistical estimation feature is the replacement for a feature that had been previously alleged to be infringing. As noted, the district court’s determination that the modified devices are in fact infringing would be irrelevant to the question whether the injunction has been violated if the differences between the two features at issue are indeed significant, thus rendering the new devices more than colorably different from the original ones. It is also possible that, in a new infringement proceeding, a fact finder could conclude that the PID filter in EchoStar’s redesigned device meets the “parsing” limitation and that the devices continue to infringe the asserted claims, but that should not be decided in a contempt proceeding.
We therefore vacate the district court’s finding of contempt for violation of the infringement provision and remand to the district court to make that factual determination under the guidance that we have provided today. If the district court determines that there are more than color-able differences between the two devices,[3] EchoStar is entitled to a new infringement proceeding.[4]
Consequently, we also vacate the district court’s order awarding TiVo “$1.25 per subscriber per month plus interest,” totaling approximately $110 million, for EchoS-tar’s continued infringement by EchoStar’s modified software during the stay of the injunction and the district court’s order requiring EchoStar to seek preclearance for any future attempts to design around the patent. On remand, the district court is required to separately calculate and award TiVo damages at the rate of “$1.25 per subscriber per month plus interest” for the use of the original infringing software during the stay of the injunction.
B.

Contempt for Violation of the Disablement Provision

We consider next EchoStar’s arguments that the injunction is unenforceable either because it is overly broad or it is too vague to provide fair notice of what it actually prohibits. We find both arguments unpersuasive.
1. Vagueness
EchoStar argues that the only natural reading of the phrase “disable the DVR functionality ... in ... the Infringing Products” is that EchoStar was re- *885 quired to disable only products that maintained the infringing functions, and not products that did not continue to infringe. Presuming that its redesigned software was noninfringing, EchoStar argues that it had no obligation to disable the DVR component of the new software. In light of the district court’s later reading of the provision as barring all DVR functionality in all of the enumerated receiver models regardless of later modifications to the software, EchoStar argues that the express language failed to provide EchoStar with even the slightest hint that the district court was thinking about non-infringing functionality that had yet to be invented. In the absence of fair notice of the district court’s interpretation of the provision, EchoStar, citing the Supreme Court’s decision in Granny Goose Foods, Inc. v. Teamsters, argues that it cannot be held in contempt of an order that was not “sufficiently specific and definite.” 415 U.S. 423, 445, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).
We reject EchoStar’s argument that vagueness can operate as a defense to the district court’s holding of contempt here. Under the Federal Rules of Civil Procedure, “[e]very order granting an injunction ... shall be specific in terms [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.” Fed.R.Civ.P. 65(d). Rule 65(d) “was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.” Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). Thus, the judicial contempt power is a potent weapon that cannot be founded upon “a decree too vague to be understood.” Int’l Longshoremen’s Ass’n v. Phila. Marine Trade Ass’n, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). On the other hand, where a party faced with an injunction perceives an ambiguity in the injunction, it cannot unilaterally decide to proceed in the face of the injunction and make an after-the-fact contention that it is unduly vague. McComb, 336 U.S. at 192, 69 S.Ct. 497.
EchoStar’s vagueness defense rests on its argument that the term “Infringing Products” in the district court’s injunction is ambiguous, thereby rendering the injunction vague and unenforceable. The disablement provision deals separately with the receivers already placed in EchoStar’s customers’ homes and new placements that are yet to reach the customer. EchoStar notes that while the first directive of the disablement provision calls for EchoStar to “disable the DVR functionality of the Infringing Products that have been placed with an end user or subscriber,” the sentence following it requires that “[t]he DVR functionality, storage to and playback from a hard disk drive shall not be enabled in any new placements of the Infringing Products.” EchoStar argues that this second sentence, because it references new placements, requires that the term “Infringing Products” be read as referring only to infringing functionality. After all, EchoStar continues, one does not disable a function that has yet to be devised or installed. As for the court’s definition of the term “DVR functionality,” EchoStar argues that the definition “all storage to and playback from” refers merely to the entire infringing function. Moreover, EchoStar argues that a provision that requires such detailed “sentence diagramming” to arrive at the district court’s reading of the order cannot be sufficiently “specific and definite” to satisfy the contempt standard. If the district court wanted to prevent EchoStar from deploying modified DVR functionality *886 on its receivers, EchoStar suggests, it should have specifically done so.
We do not agree with EchoS-tar that the stretched reading of the disablement provision that it proposes allows it to collaterally attack the district court’s injunction at this stage of the proceedings. We agree that in certain circumstances vagueness can operate as a defense to contempt. Granny Goose, 415 U.S. at 445, 94 S.Ct. 1113. In a case such as this, however, where a party has bypassed opportunities to present its asserted vagueness claim on appeal or through a motion to clarify or modify the injunction, the party cannot disregard the injunction and then object to being held in contempt when the courts conclude that the injunction covered the party’s conduct. McComb, 336 U.S. at 192, 69 S.Ct. 497 (“Respondents could have petitioned the District Court for a modification, clarification or construction of the order.... They undertook to make their own determination of what the decree meant. They knew they acted at their peril.”); see also Chaganti & Assocs., P.C. v. Nowotny, 470 F.3d 1215, 1224 n. 2 (8th Cir.2006); Szabo v. U.S. Marine Corp., 819 F.2d 714, 718 (7th Cir.1987) (“Not having appealed from the grant of the injunction, U.S. Marine cannot argue that it is too vague to be enforced.... ”); Polo Fashions, Inc. v. Stock Buyers Int’l, Inc., 760 F.2d 698, 700 (6th Cir.1985) (“The defendants acted at their own risk by failing to seek the court’s interpretation of the injunction if they had any good faith doubt as to its meaning or by failing to have it set aside or amended if they thought it was defective.”); Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 646 F.2d 800, 808 (2d Cir.1981) (“[A] party to an action is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt. The party and his counsel have a duty to ... ascertain the terms of any order entered against the party”).
EchoStar’s reading of the disablement provision is contrary to the most natural reading of the provision, as it would necessarily render the injunction vague on its face. The injunction clearly defines the term “Infringing Products” in terms of eight actual receiver models, specifically listing each model number.[5] If the term “Infringing Products” in the disablement provision were to refer merely to products containing infringing functionality, the court’s definition of the term, immediately preceding the disablement provision, as a list of eight receiver models would directly contradict EchoStar’s understanding of the term. If that were the case and the injunction were in fact facially vague and susceptible of two alternative readings, the burden was clearly on EchoStar to seek clarification or modification from the district court. McComb, 336 U.S. at 192, 69 S.Ct. 497. EchoStar did neither. Nor did it ever disable any DVR functionality in even a single receiver that had been found infringing by the jury. It unilaterally decided that downloading modified software to its infringing receivers was sufficient to comply with the district court’s injunction.
In McComb, employers faced with an order barring them from violating any provision of the Fair Labor Standards Act relating to minimum wage, overtime, or record keeping argued that, because they had changed their methods of computing hours worked, and because the modified practices were “not specifically enjoined,” they were immune from contempt pro *887 ceedings. The Court disagreed, roundly condemning a rule that “would give tremendous impetus to the program of experimentation with disobedience of the law.” Id. The Court stated that a rule requiring the conduct at issue in contempt to have been “specifically enjoined” would “prevent accountability for persistent contumacy.” Id. EchoStar’s position here, in essence, arguing that it was not “specifically enjoined” from downloading modified DVR software in place of the infringing software, is not very different, and we find the Supreme Court’s decision in McComb binding. See also Walker v. Birmingham, 388 U.S. 307, 316-17, 320, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (refusing to permit a collateral challenge to the validity of an injunction despite the fact that the “breadth and vagueness of the injunction itself would ... unquestionably be subject to substantial constitutional question,” and emphasizing that “the way to raise that question was to apply to the ... courts to have the injunction modified or dissolved.”) (emphasis added). Fifth Circuit law, applicable here, similarly places the burden on the party faced with the injunction. Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 517 (5th Cir.1969) (“If for some reason Gulf King had doubts about the meaning of any part of the injunction, it could have sought district court clarification.”).
The cases cited by EchoStar in its argument that it is entitled to raise the vagueness defense at this time are inapposite. The Supreme Court’s decision in Granny Goose involved an ex parte temporary restraining order, such that, unlike EchoS-tar, the defendants were not involved in the proceedings leading to the issuance of the order. Moreover, the Supreme Court considered only the duration of the order, not whether any terms in the order were so vague as to make it unenforceable. Granny Goose, 415 U.S. at 445, 94 S.Ct. 1113 (“There being no order to violate, the District Court erred in holding the Union in contempt.”). Thus, we find Granny Goose inapplicable to the factual circumstances presented here.
In International Longshoremen, the record of the lower court proceedings made it abundantly clear that the alleged contemnor did not understand the terms of the order, repeatedly telling the district court, “I don’t know what this order means,” but receiving no clarification. 389 U.S. at 70-71, 88 S.Ct. 201. Indeed, the order there was simply a blanket statement requiring the union to “to comply with and to abide by the said [arbitrator’s] Award,” but the award contained “only an abstract conclusion of law, not an operative command capable of ‘enforcement.’ ” Id. at 74, 88 S.Ct. 201 (holding that the order at issue could “only be described as unintelligible”). The Supreme Court expressly explained that “[w]e do not deal here with a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate.” Id. at 76, 88 S.Ct. 201. The injunction here is not unintelligible. Moreover, from the time that the injunction issued to the time that the district court found it in contempt, EchoStar never once raised the facial ambiguity that it now finds in the injunction. It cannot now spring its ambiguity defense to avoid contempt on the basis of its self-serving interpretation of the court’s injunction. To hold otherwise would indeed impose an unnecessarily heavy burden on district courts to draft immaculate orders — a burden that neither the federal rules nor the Supreme Court mandate — and would radically constrict district courts’ inherent power to enforce their orders. We decline to do so and conclude that EchoStar has waived its vagueness arguments.
The dissent cites our precedent and several cases from our sister circuits to argue *888 that contempt is improper, even in the absence of a direct appeal, if the contemnor can later propose an interpretation of the injunction that allows the conduct on which the contempt allegation is based. Given the strained nature of EchoStar’s proposed reading of the disablement provision [6] and the fact that it had ample notice of the proposed terms of the injunction as well as a full and fair opportunity to litigate the issue,[7] we do not find the law cited by the dissent persuasive on the facts before us. Some of the cited cases address conduct that simply could not have violated the order at issue, thus finding no application to this case. See, e.g., Abbott Labs., 503 F.3d at 1383 Others cover orders that were truly inadequate to meet the mandate of Rule 65, similar to the one in International Longshoremen. See, e.g., Common Cause v. Nuclear Regulatory Comm’n, 674 F.2d 921, 926-27 (D.C.Cir.1982); H.K. Porter Co., Inc. v. Nat’l Friction Prods. Corp., 568 F.2d 24, 27 (7th Cir.1977).
Moreover, most of the cases cited deal with situations very different from the one presented here and address specific circumstances where it may be proper to allow vagueness as a defense to contempt, such as with ex parte orders being enforced against non-parties to the order, see, e.g., U.S. v. Saccoccia, 433 F.3d 19, 21-22 (1st Cir.2005); N.Y. Telephone Co. v. Commc’ns Workers of Am., 445 F.2d 39, 42 (2d Cir.1971); or consent decrees that did not provide adequate notice to the enjoined party,[8] see, e.g., Perez v. Danbury Hosp., 347 F.3d 419, 422 (2d Cir.2003); Gates v. Shinn, 98 F.3d 463, 464 (9th Cir.1996); Harris v. City of Phila., 47 F.3d 1342, 1344 (3d Cir.1995). More importantly, we decide that the facts presented here fall squarely within the holding of McComb, and we are not persuaded that we are inconsistent with Supreme Court precedent.
2. Overbreadth
EchoStar argues that even if the district court’s reading of the disablement provision is the proper one, the order would still be unenforceable because the prohibition of noninfringing activity is unlawful. EchoStar contends that it simply downloaded noninfringing software to the *889 receivers that it had placed with consumers. EchoStar argues that the district court’s injunction cannot prohibit such noninfringing design-arounds. Because such an injunction would be unlawfully overbroad, EchoStar contends that it should not be expected to “appeal an unnatural reading of an injunction” at the time that the injunction issued. We disagree and conclude that a broad reading of the disablement provision to include all DVR functionality is not “unnatural” and that having failed to raise the issue on direct appeal, EchoStar is now barred from using it as a defense to the district court’s finding of contempt.
EchoStar’s primary business is satellite television transmission, and the products that were found by the jury to infringe TiVo’s patent are satellite receivers that receive and display broadcasts to users. The DVR functionality that allows users to record and play back such broadcasts is merely one of the software components of the receivers. The disablement provision of the injunction required disablement only of that DVR software component in eight specific models of receivers that had been found infringing by the jury. J.A. 162. The district court further defined “DVR functionality” as “all storage to and playback of ... television data.” Id. Plainly, the word “all” refers to all DVR functionality, infringing or not, and that is not an unnatural reading of the disablement provision. The second directive of the disablement provision, requiring EchoStar not to enable DVR functionality in any new placements of the receivers, ie., DVR functionality that could potentially be non-infringing, supports a plain reading of the word “all.” It was therefore not “unnatural” to read the court’s order as a prohibition on employing any type of DVR software, infringing or not, on those listed receiver models.
Supreme Court precedent is clear on the issue. The time to appeal the scope of an injunction is when it is handed down, not when a party is later found to be in contempt. Maggio v. Zeitz, 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948). In Maggio, affirming an appeals court’s conclusion that a bankruptcy order “is subject only to direct attack, and that its alleged infirmities cannot be relitigated or corrected in a subsequent contempt proceeding,” the Supreme Court stated that “[i]t would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.” 333 U.S. at 69, 68 S.Ct. 401. Sixty years later, that law remains unchanged. Travelers Indemnity Co. v. Bailey, — U.S. —, 129 S.Ct. 2195, 2203, 174 L.Ed.2d 99 (2009). In Travelers, claimants sought to overturn a bankruptcy court order interpreting an injunction previously issued by that court, barring any •future claims against insurer defendants. The Second Circuit agreed with the claimants that the previously issued order could not be enforced according to its terms because the bankruptcy court had exceeded its jurisdiction when it issued those orders in the first place. Rejecting the Second Circuit’s willingness to entertain this collateral attack, the Supreme Court held the challenge foreclosed — even though it concerned the bankruptcy court’s subject matter jurisdiction and statutory authority to issue such an order — because it could have been raised on direct appeal. Id. at 2205-06. Fifth Circuit law, applicable here,, is also in accord on the issue. See W. Water Mgmt., Inc. v. Brown, 40 F.3d 105, 108 (5th Cir.1994) (holding that the scope of an injunction may be challenged only on direct appeal).
*890 We therefore conclude that EchoStar’s arguments on overbreadth of the district court’s injunction have been waived by its failure to raise them earlier. Had EchoS-tar brought an appeal on the injunction at the time that it issued, arguing that the injunction was overbroad, we could have addressed its legitimacy.[9] The time to do so has long passed. “It is just as important that there should be a place to end as that there should be a place to begin litigation.” Travelers, 129 S.Ct. at 2206 (citations omitted).
As a result, we affirm the district court’s finding of contempt and the $1.00 per subscriber per month, totaling approximately $90 million, awarded by the district court as a sanction against EchoStar. The district court expressly stated that this award was made on alternative grounds, ie., for violation of either of the two separate provisions of the injunction, that dealing with disablement and the other dealing with infringement.[10] See TiVo, 655 F.Supp.2d at 663, 666 (stating that “[i]n the alternative, the Court found that EchoStar had failed to comply with the plain directives of [its] order,” and awarding the “additional $1.00 sanction to promote EchoStar’s compliance with [its] orders.”). Although we vacate the finding of contempt of the infringement provision, the finding of contempt of the disablement provision has been affirmed. We therefore have no basis for modifying the amount of the sanction.
Conclusion
In sum, we vacate the court’s holding of contempt of the infringement provision and remand for the court to make a finding concerning any colorable difference between the previously adjudicated infringing devices and the newly accused devices. We vacate in part the damages awarded for continued infringement. We affirm the district court’s finding of contempt of the disablement provision of the court’s injunction and the sanctions imposed by the district court.
AFFIRMED IN PART, VACATED IN PART, AND REMANDED

. We do not suggest that the law on obviousness is binding in contempt proceedings, where, in most cases, a single limitation that has been modified by an infringer is at issue. *883 However, the innovative significance of the modification is best viewed in light of the existing art and from the perspective of one of ordinary skill in the art.

. See, e.g., KSM, 776 F.2d at 1524; Martin v. Trinity Indus., Inc., 959 F.2d 45, 47 (5th Cir.1992); AMF, Inc. v. Jewett, 711 F.2d 1096, 1100 (1st Cir.1983); Stringfellow v. Haines, 309 F.2d 910, 912 (2d Cir.1962); Telling v. Bellows-Claude Neon Co., 77 F.2d 584, 585 (6th Cir.1935).

. EchoStar asserts that its statistical estimation methodology is the subject of a U.S. patent. That fact alone, EchoStar suggests, serves as prima facie evidence of colorable differences. We disagree. The colorable differences analysis should be based on the court’s independent evaluation of specific differences between the original and the modified products. Here, the court must compare the newly developed statistical estimation feature with the original start code detection feature to determine if the difference between the two is significant.

. We make no holding as to how a district court should proceed in a new infringement proceeding. As we have stated before, the district court is able to utilize principles of claim and issue preclusion (res judicata) to determine what issues were settled by the original suit and what issues would have to be tried. KSM, 776 F.2d at 1532.

. It is notable that the district court’s definition of "Infringing Products” is consistent with the products found by the jury in the earlier infringement proceeding to infringe TiVo’s patent. See Verdict Form at 2-3.

. The dissent argues that the district court read the term "Infringing Products” in the two provisions of the disablement provision inconsistently in order to find EchoStar in contempt. We need not reach that issue because there is a clear definition of that term at the beginning of the order that contradicts EchoStar's proposed reading of the term.

. TiVo's Proposed Permanent Injunction was submitted on May 26, 2006. JA 7820-24. Both the merits and the wording of the injunction were fully briefed and were the subject of a hearing held on June 28, 2006. Thereafter, the district court issued a thorough order addressing the eBay factors and the parties’ arguments related thereto. TiVo Inc. v. EchoStar Commc'ns Corp., 446 F.Supp.2d 664 (E.D.Tex.2006). In short, the parties were intimately involved in the proceedings leading up to the injunction, as well as its wording, and the injunction was the result of careful consideration by the district court.

. With consent decrees, it is generally the case that a district court summarily approves the agreement that the parties reach. Where disputes later arise in such cases, the court is required, for the first time, to interpret the letter of the contract and determine the intent of the parties. Thus, in such cases, contempt can be disfavored where the party had no notice that the decree barred the alleged conduct. In determining notice to the alleged contemnor, courts are limited to the four corners of the decree. United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971) (”[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.”). The situation here is very different.

. We note, however, that, although we have strongly discouraged judicial restraint of non-infringing activities, Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1367 (Fed.Cir.1998), we have never barred it outright and instead have repeatedly stated that district courts are in the best position to fashion an injunction tailored to prevent or remedy infringement. See Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 777 (Fed.Cir.1993). Because it is not before us in this case, we make no en banc holding on that issue.

. We do not agree with the dissent's suggestion that the "disablement provision” is limited only to products that had been placed with end users. Dissent at 892-93. On the contrary, the district court and the parties have thus far referred to both directives of that provision, i.e., that relating to units placed with end users as well as that on new placements, together as the "disablement provision,” and the district court imposed sanctions for the violation of the entire "disablement provision.”